IN RE GROW.

(No. 83-052—Decided July 13, 1983.)

Court of Claims of Ohio.

*Mr. Michael J. McDonald,* for appellee.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, and *Ms. Marie Charvat,* for appellant.

BAYNES, J.[1] This is a decision on an appeal by the Attorney General from an order of a three-commissioner panel which reversed the order of a single commissioner denying an award of reparations from the Victims of Crime Fund on grounds that the applicant-victim (appellee herein) was chargeable with contributory misconduct.

The panel of commissioners awarded the appellee the full net amount of work loss of $1,782.03 for a period of seven weeks and two days ending on September 25, 1980. If the award is reasonable and lawful, appellee will be enabled to make a supplementary application hereafter since he has probably had no employment since September 26, 1980.

In addition to the matters in the file upon which the single commissioner made his determination, the panel of commissioners heard oral testimony of the appellee. He and the offender had jointly occupied the dwelling where the incident occurred. At about 10:10 p.m. on June 21, 1980, the appellee came to get certain furniture and personal belongings which

---

[1] Attorney-administrative assistant Claudia Dillahunty's collaboration is acknowledged.

gave rise to an argument. During this visit, the appellee threw a clock which broke on the couch. He related:

"* * * And he picked up his shotgun and he, you know, followed me around the house. And I had a jacket on similar to this, but it had pockets in it. And out of this pocket, I pulled out a cigarette. I'm getting ready to go upstairs and get my stuff. And out of this pocket I went to get my lighter and whenever I was like that, you know, the gun just went off."

He also testified that neither Danny nor Wesley Johnson were in that part of the house where the shooting took place and neither of them saw it. In response to a question as to whether he had ever discussed filing charges against the offender, he stated that he had only talked to Mr. McDonald (his lawyer) about it.

The panel made a finding of fact that: "The applicant did not make provoking gestures as if he were reaching for a gun." Their conclusion of law was: "The Applicant's conduct immediately prior to his injuries did not constitute contributory misconduct within the meaning of R.C. 2743.60(D)."

The Attorney General is authorized to appeal conclusions of law made by a panel of Court of Claims commissioners. R.C. 2743.61(A). The Attorney General's claim of error is:

"The three-commissioner panel erred in determining that there was no presence of contributory misconduct on the part of the Applicant in a decision based solely on Applicant's statements and the affidavit of Danny Johnson, dated June 5, 1981."

At issue is the credibility of the affidavit of Danny Johnson who, along with Wesley Johnson, told the investigating officer that they thought Marcus Grow had a gun stuck in his pants and the offender only shot him in self-defense. This they reconfirmed on August 5, 1980, forty-six days after the incident. The affidavit which was signed on June 5, 1981, was considered by the single commissioner and the panel. It was averred, among

other things, that Danny Johnson and his brother were the two witnesses to the incident, and that:

"* * * he has never stated Mr. Grow manifested the idea that he had a gun in his pants. * * *

"So far as Affiant knows, his brother Wesley's thoughts and statements in this regard are consistent with Affiant's.

"Affiant believes that his statement to the Dayton Police may have been misconstrued because he positively responded to the inquiry of whether Mr. Grow possibly had a gun.

"Affiant says that he made this response only because he would have no way of knowing whether or not Mr. Grow had a gun.

"Affiant says, however, that he did not think that Mr. Grow had a gun * * *."

The content and composition of the affidavit is certainly adroit. The obvious rationalizing and exculpatory character of the averments, together with the fact that the appellee's testimony was that neither of the Johnsons saw the shooting, nullifies, almost totally, the affidavit's probative value.

The credibility of the affidavit is vigorously attacked in the argument of the Attorney General. The Attorney General asks whether more credence cannot be placed upon statements contemporaneously made by then disinterested witnesses compared to an under-oath statement to be used for one purpose, namely, to obtain a favorable award from the commissioner(s) almost one year later.

The Attorney General argued in his brief to the court that police reports are an exception to the hearsay rule under terms of Evid. R. 803 (1) and (2) which are, respectively, the "present sense impression" and the "excited utterance" exceptions. It is not persuasive that either exception, as such, is applicable to the record in the instant case. It would appear, that if any rule of evidence is applicable at all, it is Evid. R. 803 (8), the "public records and reports" exception. Except for its built in limitations, it might be pertinent. See Anderson's Ohio Evidence, Civil and Criminal (1980), Section 803.102.

Evid. R. 803 (8)(b), in its restrictions on the use of public records and reports in criminal cases, prevents use of the records or reports from police officers and other law enforcement personnel concerning matters observed, pursuant to official duties. Many of such observations may have been obtained externally, and not internally, in the course of regular office operational activity. However, an accused may introduce any such record where it is favorable to him. See Anderson's Ohio Evidence, *supra,* Section 803.107, at page 92. There is:

"A critical distinction between the official records exception of Rule 803 (8) and that utilized in the federal courts under the Federal Rule 803 (8) is the absence in the Ohio Rule of a subdivision specifically authorizing the admission of the contents of investigative records and reports which contain 'factual findings' resulting from duly authorized governmental inquiry. While Federal Rule 803 (8)(C) provides such statements are not admissible against the accused under any circumstances, regardless of who prepared the report and regardless of whether the report was routine and nonadversarial, the Federal Rule expressly authorizes the admission of such evidence in all civil cases and in criminal cases when offered by the accused. * * *" Anderson's Ohio Evidence, *supra,* Section 803.108, at pages 93-94.

The Victims of Crime Act constitutes a special statutory proceeding. " 'The right to participate is controlled by compliance with special criteria and restrictions contained in the Act * * *.' " *In re Schroepfer* (1983), 4 Ohio Misc. 2d 15, 17.

One of the provisions of the Act which has remained unchanged from the Act as originally passed is:

"* * * A single commissioner or a

panel of commissioners may order law enforcement officers as defined in division (K) of section 2901.01 of the Revised Code to provide them with copies of any information or data gathered in the investigation of the criminally injurious conduct that is the basis of any claim *to enable the commissioners to determine whether, and the extent to which, a claimant qualifies for an award of reparations."* R.C. 2743.55 (A). (Emphasis added.)

R.C. 2743.53 (B) confers the same authority on the Court of Claims. The competency of police investigative data was recently implemented by the legislature in its recent amendment to R.C. 2743.61 (A), effective March 18, 1983. The added provision is that on appeal the court shall hear and determine the appeal on "any information or data provided to the court of claims pursuant to division (B) of Section 2743.53 of the Revised Code."

Decisions of this court have construed R.C. 2743.55 (A) in connection with intelligence unit reports relating to organized crime activities. *In re Bonarrigo* (Nov. 4, 1981), Court of Claims No. 81-037, unreported. It has also been considered with respect to an attorney's work-product of a special counsel to the city law department and the attorney-client privilege referred to in R.C. 2743.62 (A) and 2743.63. *In re Wadud* (Nov. 3, 1981), Court of Claims No. 83-036, unreported.

A reasonable and perhaps the only possible construction of a law enforcement agency's investigation factual findings reports, "to enable the commissioners to determine whether, and the extent to which, a claimant qualifies for an award of reparations," is that such reports are to be considered as proof of the truth of the facts contained therein. The fact that such report may contain conclusions, or that some statements may be first, second or third level hearsay, does not make any part of the report incompetent evidence. The legislature in providing for this class gift to a victim has the power to enact any rule of evidence not ordinarily permitted, evidentiary rules to the contrary notwithstanding, absent any constitutional limitation.

In considering the weight of facts found, contained in any such report, the commissioners may give them such weight as they deem proper when weighing it, for example, against the oral testimony of a claimant twenty-two months after the fact as in the case *sub judice.* In consideration of the "manifest weight of the evidence," on appeal the court must also consider whether, and to what extent, the conclusions and the hearsay are trustworthy. Appellee's lawyer ignores R.C. 2743.55 (A) when he categorically states: "In fact the only admissible evidence [as to the incident] would be the testimony which the Applicant gave before the panel of three commissioners." The investigatory police report cannot, as it is argued, be disregarded, in making or denying an award of reparations.

Moreover, the single commissioner is authorized to determine a claim administratively. R.C. 2743.55(C) provides in part: "The commissioner may determine the claim and make an award *administratively without a hearing."* (Emphasis added.) To deny the commissioner a right to consider the evidentiary value of the police reports would so inhibit and restrict the commissioner in making findings and conclusions as to prevent a reasonable determination. So, if the police reports are competent for the single commissioner to consider, they cannot be less so for the three-commissioner panels.

In his testimony before the panel of commissioners, appellee testified:

"Q: Did you confer, at any time, with someone from the City Prosecutor's Office or the County Prosecutor's Office?

"A: The only one I talked to was Mr. McDonald [his attorney]. There was * * * no one came and asked me what happened. No police report or anything. The

only thing that there is, is what he [the offender] said.''

Although the police report does not contain any direct statement of the appellee, it states that he was found lying on the ground at the corner near the scene and was incoherent. The officer then went inside the house where the shooting occurred when the Johnsons gave a statement as to the events leading up to the shooting and the shooting. At the hospital, the appellee was still incoherent. The suspect-offender was interviewed a day or two after the incident. His story followed the story given by the two witnesses (the Johnsons).

Appellee was hospitalized on June 21, 1980 (after emergency room treatment on June 20th), and was discharged July 12, 1980. His hand was operated on June 22, 1980. The hospital record psychiatric interview on June 30, 1980 states: "The history reflects explosive temperature [sic] and numerous physical fights in relationship to others whom he has been unable to count on. * * * It became evident that he has relationships [sic] far better quality with woman [sic] than in the case with men. * * * This young man has suffered an inordinate amount of stress during the past half year and I feel he is handling [it] surprisingly well. * * *''

The police report indicates appellee was contacted on June 23 and 26 and on July 1. Those three dates were while he was hospitalized. The last contact the police had with him was on August 5, 1980. On that date the appellee stated he wanted the offender prosecuted. The two Johnsons were recontacted and they reaffirmed their original statements. The police presented their investigation to the Montgomery County Prosecuting Attorney who refused to prosecute the offender concluding he was acting in self-defense. The appellee was then recontacted and told of the prosecutor's determination.

Also, the following facts ought to have been considered by the panel of commissioners in making its determination.

The affidavit of Danny Johnson fails to corroborate that the appellee had a cigarette in his hand or mouth, or that he was reaching for a lighter in his jacket pocket as he testified. No cigarette lighter was recovered at the scene and tagged for evidence.

There is no indication that the panel was aware of the psychiatric report contained in appellee's medical records. This report disclosed a belligerent attitude both prior to and subsequent to the incident. Another medical report reflects that in the past he had broken ribs, not specifically explained, and that his left hip at the buttock showed a gunshot wound. Or the fact that by his own testimony, he had been sentenced to the Ohio State Reformatory on a sentence arising from an armed robbery charge.

Further, the panel did not recognize that the reports of the incident were presented to the Montgomery County Prosecuting Attorney who found that a defense of self-defense warranted not prosecuting the alleged offender; or appellee's denial that the police had not interviewed him about the case when the investigation report stated interviews on four separate dates; or the inconsistency between the Johnson affidavit and appellee's testimony that the two Johnson witnesses did not see the shot fired; or make any reference to the ambivalent quality of the Danny Johnson affidavit.

The panel concluded that the single commissioner improperly relied on the police report contra the affidavit of Danny Johnson; that the affidavit corroborated the testimony of the applicant before them; and that the Attorney General failed to produce evidence to contradict the Johnson affidavit. From these three items it was further concluded the appellee did not make a provoking gesture as if he were reaching for a gun and his conduct did not constitute contributory misconduct.

While it may be true there are some deficiencies in the printout of the report

of the Dayton Police Department in this instance, it is not necessarily subject to all queries, interpretations and insinuations levelled against it on appellee's behalf. There does not appear to be any inherent lack of trustworthiness in the recitals it contains.

It appears that the panel's conclusions are oriented, grounded and fixed by the argument advanced on appellee's behalf that the police officers' reports are not admissible or, at least, not to be considered unless corroborated by testimony. Accordingly, a conclusion is warranted that the panel of commissioners did not consider the police report to have probative value in determining whether appellee was entitled to an award of reparations; nor did they test the credibility of his testimony with regard to other facts in the record above set forth.

Accordingly, the court finds and concludes the order of the panel appealed from is contrary to the manifest weight of the evidence and was erroneously entered.

Assuming *arguendo* appellee's conduct did not constitute contributory misconduct, then in that event, the evidentiary record raises the issue, whether he is entitled to an award by virtue of a limitation on a right to an award set forth in the second sentence of R.C. 2743.60(B):

"Unless a determination is made that the interests of justice require that an award be made in a particular case, an award of reparations shall not be made to the spouse of, or a person living in the same household with, the offender * * *."

There is conflict and ambiguity as to whether at the time of the incident appellee was technically living in the same household as the offender, as he was in the process of moving out, so as to require application of the above-quoted R.C. 2743.60(B) provision.

This probably, if it was determined appellee was not "a person living in the same household with the offender," would require application of R.C. 2743.52 which provides:

"The court of claims commissioners that are appointed pursuant to Section 2743.54 of the Revised Code have jurisdiction to make awards for economic loss *arising from* criminally injurious conduct, if satisfied by a preponderance of the evidence that the requirements for an award of reparations have been met." (Emphasis added.)

If the facts would warrant or require a finding that appellee's injury occurred in the course of, "arising from" or resulting from his living in the same household with the offender, then this would entail an *in pari materia* construction of sections R.C. 2743.52 and 2743.60(B) of the Victims of Crime Act as in *In re Schroepfer, supra,* at page 17.

In that event the burden of proof as to "interests of justice requiring an award would be upon the Applicant-Appellant." See *In re Kurinsky* (March 21, 1983), Court of Claims No. 83-016, unreported, a case where the record was silent as to the interests of justice so that an award of reparations was not warranted.

Since the quoted provision of R.C. 2743.60(B) was not raised in the commissioner(s)' orders and was not addressed by counsel, and since the appeal was determined on the weight of the evidence issue, it is unnecessary for the court to further address the issue raised by the assumption.

This appeal brought into direct question the intent of the legislature in enacting R.C. 2743.55(A). The services of an attorney were also necessary to define appellee's rights by virtue of an award made by the panel of commissioners. By terms of R.C. 2743.65(A), appellee's attorney is entitled to an award of fees on the court appeal. Attention should be given to the Proposed Supreme Court Rule for the Court of Claims, Victims of Crime Compensation Section, Attorney Fees. See Ohio Official Reports, Advance Sheets,

Vol. 5, No. 5 (June 13, 1983), at A-7 to A-9.

By reason of all the foregoing, the court finds appellant's assignment of error, that the order of the panel is contrary to law, is well-taken and it is sustained. The order of the panel reversing the single commissioner's denial of an award was unreasonable and unlawful. The judgment of this court is that the order of the panel be reversed, vacated and held for naught. So ordered.

*Order reversed.*